738 F.2d 497
 UNITED STATES of America, Appellee,
v.
Donald Nixon RUSH, Larry Joseph Lancelotti, Gregory Lee
Lancelotti, Harry J. Shnurman, Robert Michael Cohen, Thomas
G. Converse, David Earl Johnson, Irving F. Imoberstag, Carl
Eric Olsen, Jacob Shnurman, Randall Collins, Jeffrey Allen
Brown, and David Nissenbaum, Defendants, Appellants.
UNITED STATES of America, Appellee,
v.
Michael Lee RISOLVATO, Defendant, Appellant.
UNITED STATES of America, Appellee,
v.
Charles LEATON, Defendant, Appellant.
 Nos. 83-1177, 83-1391 and 83-1463.
 United States Court of Appeals,
First Circuit.
 Argued May 11, 1984.
Decided June 27, 1984.
Petitions for Rehearing Denied
July 26, 1984.
 
 James R. Cook, Des Moines, Iowa, with whom Cook & Waters Law Firm, and William Kutmus, Des Moines, Iowa, were on brief, for appellants.
 James L. Sultan, Boston, Mass., by appointment of the Court, for Jacob Shnurman.
 James D. Poliquin, Portland, Me., by appointment of the Court, and Norman & Hanson, on brief, for Thomas G. Converse.
 Irving F. Imoberstag on brief, pro se.
 Carl Eric Olsen on brief, pro se.
 Jeffrey Allen Brown on brief, pro se.
 Margaret D. McGaughey, Asst. U.S. Atty., Portland, Me., with whom Richard S. Cohen, U.S. Atty., Portland, Me., and Jay P. McCloskey, Asst. U.S. Atty., Bangor, Me., were on brief, for appellee.
 Before COFFIN and BOWNES, Circuit Judges, and PETTINE,* Senior District Judge.
 BOWNES, Circuit Judge.
 
 
 1
 These appeals are taken by fifteen men convicted after a jury trial of one or both counts under a two-count indictment charging them with (a) conspiracy to possess marijuana with intent to distribute, 21 U.S.C. Secs. 846 & 841(b)(6), and (b) possession of marijuana with intent to distribute, 21 U.S.C. Secs. 841(a)(1) & 841(b)(6). Appellants' principal claims are that their speedy trial rights were violated, that some of them were denied the opportunity to raise the free exercise clause of the first amendment as a legally sufficient defense, and that motions for severance were improperly denied. We affirm the convictions.
 
 I. BACKGROUND
 
 2
 The evidence may be summarized as follows. On May 20, 1980, an isolated piece of property in Stockton Springs, Maine, was purchased by appellant D. Nissenbaum under the alias Arkin. The so-called Arkin property included several buildings with storage facilities. Five days later, an isolated shorefront property on Deer Isle, Maine, equipped with a deepwater dock and four buildings, was purchased with a $100,000 down payment in the name of a Paula Leurs. Suspecting that the two properties might be used for illegal drug trafficking, law enforcement agents established surveillance of both properties in August, 1980.
 
 
 3
 On the evening of October 19, 1980, a pickup truck was observed leaving the Arkin property loaded with material; it arrived at the Leurs property around 9:30 p.m. Shortly after 9:00 p.m., a dozen people were observed on the Leurs property carrying large objects, later identified as Zodiac rubber boats, down to the dock. Just after midnight the JUBILEE, a large, oceangoing vessel, was observed approaching from the open sea. It followed the shoreline towards the Leurs property without navigational lights, dropped anchor and cut its engines approximately one-tenth of a mile from the Leurs dock. Over a three-hour period, three rubber boats holding two people each made numerous trips between the dock area and the JUBILEE, transporting bales of what was later identified as marijuana from the JUBILEE to shore. The bales, after having been brought ashore, were loaded into pickup trucks and transported further inland.
 
 
 4
 The unloading of the marijuana bales continued for roughly three hours. At 3:05 on the morning of October 20, federal and state law enforcement officers entered the Leurs property in police cars with blue lights flashing. As the officers emerged from the cars and approached the dock area on foot, the people gathered there began to run away into the woods. The officers fanned out in pursuit. Ten of the appellants were apprehended at the time of the raid in the shore area and in the woods nearby,[1] and two more were later found crouched in a hollow a short distance from the dock.[2] Approximately twenty tons of marijuana were seized.
 
 
 5
 When the raid began, the JUBILEE cut anchor and proceeded out to sea, pursued by a police patrol boat, a coast guard search-and-rescue boat, and then a coast guard cutter. The JUBILEE was finally intercepted and boarded after a protracted chase by the cutter, and the four-man crew, including two of the present appellants,[3] was arrested.
 
 
 6
 Twenty-three people were arrested in connection with the October 20 raid and named in the original indictment returned on October 29, 1980.[4] A twenty-fourth defendant, D. Nissenbaum, was added in a superseding indictment. By the time trial commenced in December, 1982, however, two defendants had become fugitives, another two had pleaded nolo contendere, and charges had been dismissed as to four others, leaving a total of sixteen defendants facing trial on the conspiracy and possession with intent charges.[5] Of these, five were convicted on both counts,[6] one on the first count only,[7] nine on the second count only,[8] and one was acquitted on both counts.[9]
 
 II. SPEEDY TRIAL ACT
 
 7
 The Speedy Trial Act of 1974, as amended, 18 U.S.C. Secs. 3161 et seq., requires that trial commence within a specified time limit:
 
 
 8
 In any case in which a plea of not guilty is entered, the trial of a defendant charged in an information or indictment with the commission of an offense shall commence within seventy days from the filing date (and making public) of the information or indictment, or from the date the defendant has appeared before a judicial officer of the court in which such charge is pending, whichever date last occurs.
 
 
 9
 18 U.S.C. Sec. 3161(c)(1). The same section, however, also provides that certain "periods of delay shall be excluded ... in computing the time within which the trial ... must commence." Id., Sec. 3161(h). In the absence of excludable delay under (h), the starting point for computing the seventy-day limit under (c) in this case would be October 30, 1980, the day after the original October 29 indictment.[10] See Fed.R.Crim.P. 45(a); Committee on the Administration of the Criminal Law, Judicial Conference of the United States, Guidelines to the Administration of the Speedy Trial Act of 1974, as Amended [hereinafter Guidelines ] at 22-23; United States v. Mers, 701 F.2d 1321, 1332 n. 6 (11th Cir.), cert. denied, --- U.S. ----, 104 S.Ct. 482, 78 L.Ed.2d 679 (1983).
 
 
 10
 Among the time exclusions for "other proceedings concerning the defendant" are periods of "delay resulting from any pretrial motion, from the filing of the motion through the conclusion of the hearing on, or other prompt disposition of, such motion." 18 U.S.C. Sec. 3161(h)(1)(F). The exclusion for pretrial motions is automatic; a showing of actual delay is not required. United States v. Novak, 715 F.2d 810, 813 (3d Cir.1983), cert. denied sub nom. Ware v. United States, --- U.S. ----, 104 S.Ct. 1293, 79 L.Ed.2d 694 (1984); United States v. Brim, 630 F.2d 1307 (8th Cir.1980), cert. denied, 452 U.S. 966, 101 S.Ct. 3121, 69 L.Ed.2d 980 (1981). The length of time excludable under (h)(1)(F) is limited to "such delay as is reasonably necessary from the time of filing a pretrial motion to the time of conducting a hearing on it or completing submission of the matter to the court for decision." United States v. Mitchell, 723 F.2d 1040, 1047 (1st Cir.1983).
 
 
 11
 The defendants' first pretrial motion was a motion to preserve evidence, filed on November 7, 1980, by Booth and joined by other defendants. A hearing on that motion was held on November 25, 1980, and it was agreed at that time that no court action was required. The time from November 7 through November 25 was clearly excludable under (h)(1)(F), and the district court so found. The government, however, points out that a government pretrial motion for an "order permitting destruction of seized marijuana" had been filed on October 24, 1980, before the speedy trial clock was even set. A hearing on this motion was held on November 25, and it was granted in an order dated December 18. The government's motion thus overlapped the defendants', and we find that the time from October 30 until the filing of the defendants' motion on November 7 was excludable.[11]
 
 
 12
 While the government's and the defendants' motions were still pending, defendants Booth and Middleton filed numerous additional pretrial motions in which other defendants joined, which independently gave rise to (h)(1)(F) exclusions. For purposes of speedy trial computations, the relevant motions are two suppression motions, both filed on November 21, 1980. The government filed an opposition on February 4, 1981, an evidentiary hearing was held on February 23-26, and oral argument took place on March 17, 1981. The record before us leaves no doubt that the time from November 21, 1980, through March 17, 1981, was "reasonably necessary" under the standard adopted in Mitchell, 723 F.2d at 1047. On the facts in this case, we must reject the argument to the contrary. See United States v. Gonsalves, 735 F.2d 638, 641 (1st Cir.1984); United States v. Regilio, 669 F.2d 1169, 1172 (7th Cir.1981), cert. denied, 457 U.S. 1133, 102 S.Ct. 2959, 73 L.Ed.2d 1350 (1982). We agree with the district court that this entire period was excludable under (h)(1)(F).
 
 
 13
 The (h)(1)(F) exclusion applies not only to the particular defendants who file or join in pretrial motions, but also to codefendants whose trials have not been severed and whose speedy trial time has not otherwise run out. Section (h)(7) provides an exclusion for "[a] reasonable period of delay when the defendant is joined for trial with a codefendant as to whom the time for trial has not run and no motion for severance has been granted." Every circuit court that has considered this provision has held in essence that "an exclusion applicable to one defendant applies to all codefendants." United States v. Edwards, 627 F.2d 460, 461 (D.C.Cir.), cert. denied, 449 U.S. 872, 101 S.Ct. 211, 66 L.Ed.2d 92 (1980); see United States v. Tedesco, 726 F.2d 1216, 1219 (7th Cir.1984); United States v. Campbell, 706 F.2d 1138, 1141 (11th Cir.1983); United States v. Fogarty, 692 F.2d 542, 546 (8th Cir.1982), cert. denied, --- U.S. ----, 103 S.Ct. 1434, 75 L.Ed.2d 792 (1983); United States v. McGrath, 613 F.2d 361, 366 (2d Cir.1979), cert. denied sub nom. Buckle v. United States, 446 U.S. 967, 100 S.Ct. 2946, 64 L.Ed.2d 827 (1980); see also Novak, 715 F.2d at 814 (qualified by "reasonableness limitation").
 
 
 14
 We note that the Guidelines adopt a different interpretation of (h)(7). Under the Guidelines approach, an (h)(7) exclusion would be available only when a particular defendant's seventy days had already run and additional time was necessary to permit a joint trial with an unsevered codefendant as to whom the seventy days had not yet run. See Guidelines at 52-53. The Guidelines approach represents a plausible application of the statutory text. It accurately allocates exclusions to defendants on an individual basis, thus minimizing the burden on individual defendants resulting from joint trials and affording each defendant the fullest possible benefit of the Speedy Trial Act. At the same time, however, the Guidelines approach considerably reduces the amount of excludable time in joint trials and puts pressure on trial courts to sever defendants or grant "ends of justice" continuances routinely as soon as a single defendant's seventy days expire, in order to avoid having even a single nonexcludable day elapse thereafter. Moreover, the Guidelines approach calls for individual speedy trial computations which could easily become unmanageable in a multidefendant case such as the present one. We cannot square such an interpretation with the congressional intent of avoiding waste of resources on unnecessary severances and separate trials. See Novak, 715 F.2d at 814-15; S.Rep. No. 93-1021, 93d Cong., 1st Sess. 38 (1974) and S.Rep. No. 96-212, 96th Cong., 1st Sess. 24-25, reprinted in A. Partridge, Legislative History of Title I of the Speedy Trial Act of 1974 135-36 (Fed.Judicial Center 1980). The Guidelines, f course, are not binding, and we find the reasons advanced by the Eleventh Circuit in Campbell compelling on this point. See 706 F.2d at 1141-43. Therefore, although we have not previously been directly confronted by the issue, see United States v. Brown, 736 F.2d 807, 809 (1st Cir.1984), we now join the Second, Third, Seventh, Eighth, Eleventh, and District of Columbia Circuits and hold that (h)(7) "stops the [speedy trial] clock for one defendant in the same manner and for the same amount of time as for all co-defendants." Campbell, 706 F.2d at 1141.
 
 
 15
 Because of the (h)(7) exclusion, the (h)(1)(F) exclusions for the overlapping pretrial motions applied to all twenty-four defendants.[12] Up to March 17, 1981, therefore, none of the seventy days had run on the speedy trial clock. On March 17, the same day on which the suppression motions were argued, the district court issued an order scheduling trial for May 18, 1981. At the same time, the court granted motions to sever the trials of the three female defendants (J. Tranmer, C. Nissenbaum and D. Woodward) and denied the severance motions of the remaining defendants "except as follows":
 
 
 16
 (a) The trial of those defendants who will assert a "First Amendment" defense shall be severed from the trial of those defendants who will not be asserting a "First Amendment" defense;
 
 
 17
 (b) Each defendant shall advise the Court and the United States Attorney by Wednesday, April 15, 1981, as to whether or not he will be asserting a "First Amendment" defense;
 
 
 18
 (c) Counsel for those defendants who will be asserting a "First Amendment" defense shall file with the Court and serve upon the United States Attorney by Wednesday, April 15, a joint memorandum of law in support of said defense; the Government shall similarly file with the Court and serve upon defendants' counsel by Monday, May 4, its responsive memorandum;
 
 
 19
 (d) The trial of those defendants who will not be asserting "First Amendment" defense shall commence on Monday, May 18, at 10:00 a.m. (estimated one to two weeks trial time);
 
 
 20
 ....
 
 
 21
 (e) If upon the basis of counsel's written memoranda and any oral argument, the Court determines that the "First Amendment" defense is not viable, all defendants shall be prepared to proceed to trial on Monday, May 18 ....
 
 
 22
 (Emphasis in original.) Because (h)(7) carries exclusions applicable to one defendant over only to codefendants "as to whom ... no motion for severance has been granted," our computation of speedy trial time for the period after March 17, 1981, depends on a correct determination of the effect of the March 17 order. The three female defendants whose trials were unconditionally severed are eliminated from our calculations at this point, for the charges against them were subsequently dropped and they are not involved in this appeal. As for the two groups of defendants--those "who will assert a 'First Amendment' defense," whom we shall call the "first amendment" defendants, and those "who will not be asserting a 'First Amendment' defense," or the "conventional" defendants--the severance was only conditional. The court expressly stated that all defendants would be tried together if the court ruled that the first amendment defense were not viable. As it happened, the court did eventually make just that ruling, on November 23, 1982, and ordered all of the remaining defendants tried jointly. Thus, although it was contemplated for a protracted period that the trial of the first amendment defendants would take place after that of the conventional defendants in the event the first amendment defense were found valid, the precondition for the severance never came about, nor did the severance contemplated in the March 17 order ever become effective.[13]
 
 
 23
 We do not think that the order can be viewed as providing some sort of temporarily operative severance for speedy trial purposes, because it is virtually impossible to ascertain the composition of the two groups referred to in the order. The record shows that as of July 17, 1981, twelve of the twenty-one defendants remaining at that time had advised the court that they would rely on a first amendment defense,[14] eight had advised that they would not,[15] and one remained undecided.[16] By August 11, 1981, three defendants had switched to the first amendment group.[17] By September 21, 1981, three more conventional defendants had switched to the first amendment group,[18] and one had abandoned that group to become undecided.[19] On October 7, 1982, only one or two remained in the conventional group, and only one remained on October 25.[20] To compute individual speedy trial time exclusions under (h)(7) in these circumstances would give gamesmanship priority over the practicalities of trial management. We do not construe the Speedy Trial Act to require anything of the sort. We hold that the March 17 order did not effectively sever the trials of the first amendment and conventional groups, and compute speedy trial time exclusions under (h)(7) with respect to proceedings after March 17, 1981, as if the severance motion had been denied at the outset.
 
 
 24
 Between March 17, 1981, when the district court took the suppression motions under advisement, and June 24, 1981, when it issued a detailed memorandum and order denying the motions, well over thirty days elapsed. An automatic exclusion is provided in (h)(1)(J) for "delay reasonably attributable to any period, not to exceed thirty days, during which any proceeding concerning the defendant is actually under advisement by the court." Unlike the pretrial motion exclusion in (h)(1)(F), the advisement exclusion in (h)(1)(J) is expressly limited to thirty days, and cannot be extended without resort to another source of excludable time such as an "ends of justice" continuance under (h)(8). United States v. Cobb, 697 F.2d 38, 43 (2d Cir.1982); see also Mitchell, 723 F.2d at 1047 n. 6; United States v. Janik, 723 F.2d 537, 544 (7th Cir.1983). Of the ninety-eight days that elapsed between oral argument and ruling on the suppression motions, therefore, only thirty are excludable under (h)(1)(J), namely the period from March 18 through April 16, 1981.
 
 
 25
 The government argues that an independent, overlapping exclusion arose under (h)(1)(F) on March 9, 1981, when H. Shnurman filed a memorandum and proffer with respect to the first amendment defense. We reject this argument because, in our view, an offer of proof is not a pretrial motion within the meaning of (h)(1)(F). Instead, it is a submission of evidence which need not be admitted or excluded until trial; indeed, it is commonly carried over until trial. If such submissions were held to be pretrial motions or "other proceedings concerning the defendant" triggering automatic exclusions under (h)(1), the Speedy Trial Act could easily be circumvented by filing offers of proof at an early stage and then failing to press for prompt disposition. This was not the intent of Congress under (h)(1)(F), see Brown, at 810; Mitchell, 723 F.2d at 1046, or (h)(1) generally. The district court did not exclude the proffered evidence until October 25, 1982, more than two and one-half years after the proffer was filed, and did so then only indirectly, in ruling on a government motion to limit the defense evidence. The district court did not treat the proffer as a pretrial motion for purposes of (h)(1)(F), and we see no reason to do so.
 
 
 26
 When the thirty-day exclusion under (h)(1)(J) expired on April 16, 1981, the speedy trial clock finally began to run. After eleven nonexcludable days, it stopped once more because ten of the defendants[21] were being tried on similar charges in the United States District Court for the Southern District of Florida. Under (h)(1)(D), "delay resulting from trial with respect to other charges against the defendant" is automatically excludable. Appellants concede that the time from the commencement of the Florida trial on April 28 through its conclusion on June 19, 1981, was excludable.
 
 
 27
 The Florida trial disrupted the trial schedule in the present case, which had initially been set for May 18, 1981. The fallback date of June 1, 1981, was likewise precluded by the Florida trial. On June 4, 1981, stating that it had "been advised that the Florida trial has not concluded and that counsel would need additional time to prepare for trial" beyond the second fallback date of July 6, 1981, the district court entered the following order:
 
 
 28
 IT IS ORDERED that, pursuant to Title 18 U.S.C., Sec. 3161(h)(8), the ends of justice served by the further continuance of the trial would serve the ends of justice and outweigh the best interest of the public in the speedy trial. Accordingly, the trial in this action stands continued until further order of the Court and that the time from May 18, 1981 until the time of the commencement of this trial be excluded from computation under the Speedy Trial Act.
 
 
 29
 Under (h)(8), delay resulting from a continuance is excludable if the trial judge grants the continuance on the basis of findings set out in the record that the ends of justice served by granting the continuance outweigh the best interests of the public and the defendant in a speedy trial.[22] Appellants challenge the validity of the June 4 order on three grounds: that retroactive continuances are not permissible; that the findings were inadequate; and that the speedy trial exclusion was improperly open-ended.
 
 
 30
 Other courts have held that (h)(8) continuances may not be given retroactive effect--that the order granting a continuance must be made at the outset of the excludable period. Janik, 723 F.2d at 545; United States v. Brooks, 697 F.2d 517, 522 (3d Cir.1982), cert. denied sub nom. Reed v. United States, --- U.S. ----, 103 S.Ct. 1526, 75 L.Ed.2d 949 (1983); but see United States v. Cameron, 510 F.Supp. 645, 649-50 (D.Md.1981). This court has not addressed the question, United States v. Jodoin, 672 F.2d 232, 237 (1st Cir.1982), and need not do so now. Appellants concede that the entire period from May 18 to June 4 is excludable under (h)(1)(D) without regard to (h)(8).
 
 
 31
 As to the adequacy of the district court's findings, we note that, although the reasons for an (h)(8) continuance must be "reasonably explicit," United States v. Perez-Reveles, 715 F.2d 1348, 1352 (9th Cir.1983) (conclusory statements insufficient), they need not be given at the time the continuance is granted. United States v. Bryant, 726 F.2d 510, 511 (9th Cir.1984); Janik, 723 F.2d at 544-45; Brooks, 697 F.2d at 522; United States v. Clifford, 664 F.2d 1090, 1095 (8th Cir.1981); Edwards, 627 F.2d at 461, cited in Mitchell, 723 F.2d at 1043-44. The purpose of the requirement that reasons be stated is to insure careful consideration of the relevant factors by the trial court and to provide a reviewable record on appeal. Both purposes are served if the text of the order, taken together with more detailed subsequent statements, adequately explains the factual basis for the continuance under the relevant criteria. Brooks, 697 F.2d at 520-22. Indeed, although the trial court may not merely incorporate reasons by reference, Janik, 723 F.2d at 545, it is not necessary for the court to articulate the basic facts where they are obvious and set forth in a motion for a continuance. Mitchell, 723 F.2d at 1044 (motion and court ruling read as complementary documents). In the present case, the court mentioned the Florida trial and counsel's expressed need for additional preparation time as reasons for granting an "ends of justice" continuance; these are in themselves sufficient grounds under (h)(8)(B)(i) & (iv). Moreover, reviewing the protracted history of the case during the November 23, 1982 hearing on defendants' speedy trial motion to dismiss, the court elaborated on the basis of its June 4, 1981 order.
 
 
 32
 That order was entered, as the record will reflect, by agreement, indeed at the request of defense counsel, because of the Florida trial and other complications, and no defense counsel has even remotely suggested that they wished a Court order setting a trial date.
 
 
 33
 The court also attributed any unnecessary delay to the defendants:
 
 
 34
 Whatever delays have resulted in this case have been entirely ... the result of dilatory tactics and various appeals and motions, and so forth, filed by the defendants, and indeed counsel have on numerous occasions when the Court has raised the problem of speedy trial time running, counsel ... have expressly consented, agreed, and requested continuances.
 
 
 35
 The district court's findings leave us with no doubt that the June 4 continuance was properly grounded in relevant criteria under (h)(8)(B). The trial could not have gone forward without the continuance, and the delay was requested by defense counsel to enable them to prepare following the Florida trial. Moreover, we think that on its face the record shows that this case was sufficiently complex to justify a continuance under (h)(8)(B)(ii) because of the number of defendants, the plethora of motions, the potentially intricate questions raised by the first amendment defense, and the procedural tangle resulting from various defendants' changes in position. Cf. United States v. Guerrero, 667 F.2d 862, 866 (10th Cir.), cert. denied, 456 U.S. 964, 102 S.Ct. 2044, 72 L.Ed.2d 490 (1982) (court need not articulate self-evident facts supporting (h)(8)(A) continuance). We also note in passing that, although defendants do not bear the primary responsibility for alerting the court to speedy trial deadlines, this does not mean that they may deliberately obtain an (h)(8) continuance for their own convenience in the face of speedy trial concerns articulated by the trial court and then later claim that the court abused its discretion in granting the requested continuance. See Jodoin, 672 F.2d at 238; cf. United States v. Bufalino, 683 F.2d 639, 646 (2d Cir.1982),cert. denied, 459 U.S. 1104, 103 S.Ct. 727, 74 L.Ed.2d 952 (1983) (defendant may not claim Speedy Trial Act violation caused by own failure to respond to government motion).
 
 
 36
 Appellants' third objection to the June 4 continuance is not frivolous. They argue that the district court should have set a specific ending date for the continuance. See United States v. Pollock, 726 F.2d 1456, 1461 (9th Cir.1984) ((h)(8) continuance "proper only if ordered for a specific period of time"). Doubtless it is generally preferable to limit a continuance to a definite period for the sake of clarity and certainty; but at the same time it is inevitable that in some cases, like the present one, a court is forced to order an (h)(8) continuance without knowing exactly how long the reasons supporting the continuance will remain valid.[23] In this case, an alternative trial date of July 6, 1981, was rejected by defense counsel on June 4, 1981, because it was anticipated that additional preparation time would be necessary after the conclusion of the Florida trial, at whatever time that might occur. The purpose of (h)(8) continuance is to make the Speedy Trial Act "flexible enough to accommodate the practicalities of our adversary system." Mitchell, 723 F.2d at 1044. We do not think a rule barring open-ended continuances altogether serves this purpose. Moreover, Pollock appears to be the first and, so far, only case to adopt such a rule; it was decided nearly three years after the continuance was granted in this case, and we decline to apply it here. It may well be that some sort of reasonableness limitation is appropriate to prevent continuances from delaying trials unfairly and circumventing the dismissal sanctions in the Speedy Trial Act; but we need not decide at what point, if any, such a limitation might have been exceeded in this case, for even if the June 4 continuance is construed to last for only thirty days from the end of the Florida trial, i.e., through July 19, 1981 (two weeks from the alternative July 6 trial date rejected by defendants), there is no Speedy Trial Act violation.
 
 
 37
 On July 14, 1981, Booth and Middleton filed motions to dismiss on double jeopardy grounds, claiming that their convictions in the Florida proceedings barred further prosecution in this case. A hearing was scheduled for August 11, 1981, but on that date both defendants filed amendments to their motions; accordingly, the hearing was postponed until September 11. Three days later, on September 14, 1981, the district court ruled on both motions, denying Booth's (in which the eight other defendants convicted in the Florida trial had joined) and granting Middleton's. Appeals were taken by the nine defendants whose motion was denied and by the government respectively on September 17 and 22, 1981. The time from the filing of the motions on July 14 through the September 11 hearing and September 14 rulings was excludable with respect to all twenty-one defendants (aside from the three severed female defendants) under (h)(1)(F) & (J) and (h)(7). An independent exclusion then took effect under (h)(1)(E), which automatically excludes "delay resulting from any interlocutory appeal," on the date the defendants filed their appeal. United States v. McGrath, 622 F.2d 36, 40 (2d Cir.1980). We announced our decisions affirming both orders in companion cases on March 19, 1982. United States v. Booth, 673 F.2d 27 (1st Cir.), cert. denied, 456 U.S. 978, 102 S.Ct. 2245, 72 L.Ed.2d 853 (1982); United States v. Middleton, 673 F.2d 31 (1st Cir.), reh'g denied (1st Cir. Aug. 10, 1982).
 
 
 38
 Courts which have considered the question of when an appeal ends and the clock begins to run again for speedy trial purposes have generally held that the applicable date is the date on which the appellate court issues its mandate. United States v. Mack, 669 F.2d 28, 33 (1st Cir.1982); United States v. Ross, 654 F.2d 612, 616 (9th Cir.1981), cert. denied, 455 U.S. 926, 102 S.Ct. 1290, 71 L.Ed.2d 470 (1982); United States v. Cook, 592 F.2d 877, 880 (5th Cir.), cert. denied, 442 U.S. 921, 99 S.Ct. 2847, 61 L.Ed.2d 289 (1979); cf. United States v. Gilliss, 645 F.2d 1269, 1276 (8th Cir.1981) (noting Guidelines use of date district court receives appellate court's mandate). Although these cases relate to subsection (e) (time limits for retrial following appeal) rather than to (h)(1)(E), we see no reason to apply a different ending date to interlocutory appeals under the latter section. In both situations it is the date on which the mandate is issued which determines when the district court reacquires jurisdiction for further proceedings. See Ross, 654 F.2d at 616. Moreover, where various charges being tried together are appealed separately and the records with respect to both appeals are retained at the defendant's request as a single unit to facilitate review, the speedy trial clock does not begin to run again in the district court until final disposition of both charges. See United States v. Lyon, 588 F.2d 581, 582 (8th Cir.1978), cert. denied, 441 U.S. 910, 99 S.Ct. 2005, 60 L.Ed.2d 381 (1979).
 
 
 39
 In this case, the records in Booth and Middleton were kept together in this court until the latter appeal was finally decided. Although this was not at the defendants' express request, it was, at least, with their implied consent. No inquiries, let alone requests, as to the record in Booth were made between the time our mandate issued in that case on April 9, 1981, and the issuance of our mandate in Middleton on August 17, 1982. We need not address any speedy trial claims which might be raised if Middleton had not been pending before this court during that interval, however, because Middleton by itself was sufficient to stop the speedy trial clock with respect to all defendants through August 17 under (h)(1)(E) and (h)(7). Until that date, Middleton did not cease to be "a codefendant as to whom the time for trial ha[d] not yet run and no motion for severance ha[d] been granted."
 
 
 40
 From August 18 through September 20, 1982, we assume, without deciding, that no speedy trial exclusion was in effect and that these thirty-four days ran on the seventy-day clock. On September 21, 1982, a pretrial conference was held "at which an effort was made by the [district court] to set down trials of the two different groups of defendants which kept moving around back and forth and back and forth .... At that time it was agreed by all counsel ... that the speedy trial clock would stop and [speedy trial claims] would not be asserted." Appellants concede that this statement by the district court reflects an accurate account of the September 21 waiver, and they do not dispute that the time from September 21, 1982, until the impanelling of the jury on December 7, 1982, was excludable.[24] See Guidelines at 9. We find that a total of, at most, forty-seven nonexcludable days elapsed between indictment and trial: eleven days from April 17 through April 27, 1981; possibly two days between the September 14, 1981 order and the interlocutory appeal on September 17; and possibly thirty-four days between the issuance of the mandate in Middleton on August 17, 1982, and the speedy trial waiver in open court on September 21. Thus, we conclude that the seventy-day limit was not exceeded.
 
 
 41
 A separate Speedy Trial Act violation is asserted by Converse, Imoberstag, H. Shnurman and J. Shnurman, who argue--paradoxically, it might be thought--that trial took place too soon after their arraignment, depriving them of adequate preparation time. They cite section 3161(c)(2) of the Act, which provides:
 
 
 42
 Unless the defendant consents in writing to the contrary, the trial shall not commence less than thirty days from the date on which the defendant first appears through counsel or expressly waives counsel and elects to proceed pro se.
 
 
 43
 The record shows that all four appellants were arraigned on the superseding indictment on December 6, 1982, the day before trial. The record also shows, however, that at the time the superseding indictment was returned the original indictment, identical in all respects except for the addition of D. Nissenbaum as a defendant, was still outstanding, and that all four appellants had been arraigned on the original indictment on October 29 and November 7, 1980. The issue before us, therefore, is whether (c)(2) applies to the superseding indictment at all. We think not.
 
 
 44
 The Speedy Trial Plan adopted by the District of Maine provides that the thirty-day minimum time limit begins to run at the same time as the seventy-day maximum limit when a superseding indictment is returned before the original indictment is dismissed.[25] This rule, which avoids conflicting time requirements under (c)(1) and (c)(2), has been adopted by the Seventh Circuit, at least for the situation where the charges in the original and superseding indictments are identical and there is no time gap between the two indictments. United States v. Horton, 676 F.2d 1165, 1170 (7th Cir.1982), cert. denied, 459 U.S. 1201, 103 S.Ct. 1184, 75 L.Ed.2d 431 (1983); accord, Guidelines at 14. The Ninth Circuit, on the other hand, has held that the Speedy Trial Act requires that the thirty-day time limit begin to run again when a defendant is reindicted, regardless whether the original indictment has been dismissed by the time the superseding indictment is returned, at least where the superseding indictment necessitates a change in defense strategy. United States v. Harris, 724 F.2d 1452, 1454-55 (9th Cir.1984); cf. United States v. Arkus, 675 F.2d 245, 248 (9th Cir.1982) (district court Speedy Trial Plan to the contrary notwithstanding, statute requires that new thirty-day period apply where original indictment dismissed before superseding indictment returned). Both views reflect the underlying congressional purpose of insuring that defendants be afforded reasonable trial preparation time. Harris, 724 F.2d at 1455, citing United States v. Daly, 716 F.2d 1499, 1504-05 (9th Cir.1983), cert. dismissed, --- U.S. ----, 104 S.Ct. 1456, 79 L.Ed.2d 773 (1984); Horton, 676 F.2d at 1170. The statute does not explicitly provide for a new thirty-day period when the indictments overlap. Section 3161(d)(1) makes both the seventy-day and thirty-day time limits in (c) applicable if a superseding indictment is returned after the original indictment is dismissed on the defendant's motion,[26] and subsection (h)(6) provides an exclusion for any time gap between the two indictments.[27] The case before us, however, is not governed by (d)(1) or (h)(6). We think it fully consistent with the congressional purpose of (c)(2) to apply the thirty-day limit on the same basis as the seventy-day limit in (c)(1), unless in a specific case this would deprive a defendant of adequate opportunity to prepare his defense. On the facts of the present case, we conclude without hesitation that all four appellants had ample time for preparation. Indeed, the district court offered them a one-week continuance on December 6, 1982, which the court thought sufficient to cure any possible prejudice flowing from the last-minute arraignments and changes of counsel. The court's proposal was rejected. We note in addition that the appellants appear to be entirely responsible for the delay in their arraignment, which was granted at their request solely in order to save the effort and expense of superfluous pretrial appearances by counsel. Similarly, the potential conflicts which made changes of counsel necessary were apparent long before trial, and the district court acted well within its discretion in denying a longer continuance.[28] All defendants, therefore, having been promptly arraigned on the original indictment in 1980, were properly tried in December, 1982, and (c)(2) was not violated with respect to any of them.
 
 
 45
 III. FREE EXERCISE CLAUSE AND EQUAL PROTECTION
 
 
 46
 Appellants claim that they were denied the opportunity to assert a valid, legally sufficient defense based on the free exercise clause of the first amendment.[29] For purposes of this case the government stipulated to the following facts, which we assume, without deciding, are true:1) that the Ethiopian Zion Coptic Church is a religion embracing beliefs which are protected by the First Amendment; 2) that the use of marijuana is an integral part of the religious practice of the Church; and 3) that [all of the defendants] are members of the Church and sincerely embrace the beliefs of the Church.
 
 
 47
 On November 23, 1982, the district court ruled as a matter of law that the first amendment did not protect the possession of marijuana with intent to distribute by the defendants, and further ordered that the defendants be precluded from introducing at trial any evidence concerning the Ethiopian Zion Coptic Church and the use of marijuana by its members, insofar as such evidence related to their alleged first amendment defense.[30]
 
 
 48
 It is well established that the absolute constitutional protection afforded freedom of religious belief does not extend without qualification to religious conduct. Braunfeld v. Brown, 366 U.S. 599, 603, 81 S.Ct. 1144, 1145, 6 L.Ed.2d 563 (1961); Cantwell v. Connecticut, 310 U.S. 296, 303-04, 60 S.Ct. 900, 903, 84 L.Ed. 1213 (1940). When a law is challenged as interfering with religious conduct, the constitutional inquiry involves three questions: (a) whether the challenged law interferes with free exercise of a religion; (b) whether the challenged law is essential to accomplish an overriding governmental objective; and (c) whether accommodating the religious practice would unduly interfere with fulfillment of the governmental interest. See United States v. Lee, 455 U.S. 252, 256-59, 102 S.Ct. 1051, 1054-56, 71 L.Ed.2d 127 (1982).
 
 
 49
 In light of the government's stipulations, the first limb of the Lee standard is clearly met; there is no question that marijuana use is an integral part of the religious doctrine and practice of the Ethiopian Zion Coptic Church, and that appellants are sincere practicing members of that Church. The conflict with the criminal sanctions against possession of marijuana with intent to distribute is self-evident.
 
 
 50
 The question whether the government has an overriding interest in controlling the use and distribution of marijuana by private citizens is a topic of continuing political controversy. Much evidence has been adduced from which it might rationally be inferred that marijuana constitutes a health hazard and a threat to social welfare; on the other hand, proponents of free marijuana use have attempted to demonstrate that it is quite harmless. See Randall v. Wyrick, 441 F.Supp. 312, 315-16 (W.D.Mo.1977); United States v. Kuch, 288 F.Supp. 439, 446 & 448 (D.D.C.1968). In enacting substantial criminal penalties for possession with intent to distribute, Congress has weighed the evidence and reached a conclusion which it is not this court's task to review de novo. Every federal court that has considered the matter, so far as we are aware, has accepted the congressional determination that marijuana in fact poses a real threat to individual health and social welfare, and has upheld the criminal sanctions for possession and distribution of marijuana even where such sanctions infringe on the free exercise of religion. United States v. Middleton, 690 F.2d 820, 825 (11th Cir.1982), cert. denied, --- U.S. ----, 103 S.Ct. 1497, 75 L.Ed.2d 929 (1983); United States v. Spears, 443 F.2d 895 (5th Cir.1971), cert. denied, 404 U.S. 1020, 92 S.Ct. 693, 30 L.Ed.2d 669 (1972); Leary v. United States, 383 F.2d 851, 859-61 (5th Cir.1967), rev'd on other grounds, 395 U.S. 6, 89 S.Ct. 1532, 23 L.Ed.2d 57 (1969); Randall, 441 F.Supp. at 316 & n. 2; Kuch, 288 F.Supp. at 448. Only last year, the Eleventh Circuit rejected identical claims raised by some of the very appellants before us in this case, see Middleton, 690 F.2d 820, and the United States Supreme Court denied review. We decline to second-guess the unanimous precedent establishing an overriding governmental interest in regulating marijuana.
 
 
 51
 Finally, it has been recognized since Leary that accommodation of religious freedom is practically impossible with respect to the marijuana laws:
 
 
 52
 Congress has demonstrated beyond doubt that it believes marihuana is an evil in American society and a serious threat to its people. It would be difficult to imagine the harm which would result if the criminal statutes against marihuana were nullified as to those who claim the right to possess and traffic in this drug for religious purposes. For all practical purposes the anti-marihuana laws would be meaningless, and enforcement impossible.
 
 
 53
 Leary, 383 F.2d at 861, quoted in Middleton, 690 F.2d at 825; see also Kuch, 288 F.Supp. at 447. Although a narrow administrative exception has been carved out from the Schedule I classification of peyote for the benefit of the Native American Church, see 21 C.F.R. Sec. 1307.31, we think this exemption is properly viewed as a government "effort toward accommodation" for a "readily identifiable," "narrow category" which has minimal impact on the enforcement of the laws in question. Lee, 455 U.S. at 260 n. 11 & 261, 102 S.Ct. at 1057 n. 11. No broad religious exemption from the marijuana laws is constitutionally required. We therefore affirm the district court's ruling rejecting appellants' first amendment defense as a matter of law.
 
 
 54
 We reject as well appellants' claim that members of the Ethiopian Zion Coptic Church are entitled as a matter of equal protection to a religious exemption from the marijuana laws on the same terms as the peyote exemption granted the Native American Church. Marijuana is not covered by the peyote exemption; this in itself distinguishes this case from Kennedy v. Bureau of Narcotics and Dangerous Drugs, 459 F.2d 415 (9th Cir.1972), cert. denied, 409 U.S. 1115, 93 S.Ct. 901, 34 L.Ed.2d 699 (1973). Moreover, the peyote exemption is uniquely supported by the legislative history and congressional findings underlying the American Indian Religious Freedom Act, which declares a federal policy of "protect[ing] and preserv[ing] for American Indians their inherent right of freedom to believe, express and exercise the[ir] traditional religions ..., including but not limited to access to sites, use and possession of sacred objects, and the freedom to worship through ceremonials and traditional rites." 42 U.S.C. Sec. 1996. The legislative history of the Act "is clear in finding that religion is an integral part of Indian culture and that the use of such items as peyote are necessary to the survival of Indian religion and culture." Peyote Way Church of God, Inc. v. Smith, 556 F.Supp. 632, 637 (N.D.Tex.1983). In light of the sui generis legal status of American Indians, see Cherokee Nation v. Georgia, 30 U.S. (5 Pet.) 1, 16-17, 8 L.Ed. 25 (1831) (Marshall, C.J.), and the express policy of the American Indian Religious Freedom Act (which was passed after Kennedy was decided), we think the Ethiopian Zion Coptic Church cannot be deemed similarly situated to the Native American Church for equal protection purposes.
 
 IV. SEVERANCE
 
 55
 At trial, the sixteen defendants aligned themselves in two groups asserting different defense theories. One group, known as the "conventional" defendants,[31] decided to put the government to its proof, alleging that there was insufficient evidence to convict them of conspiracy or possession with intent to distribute. The other group, known as the "Swiderski " defendants,[32] contended that they could be convicted of no crime more serious than simple possession because, they alleged, they had acquired joint and simultaneous possession of the marijuana and intended to share it only among themselves rather than distribute it to third persons. See United States v. Swiderski, 548 F.2d 445, 450-51 (2d Cir.1977). Numerous motions were made for separate trials of the two groups under the applicable federal rule[33]; the district court, however, found that the positions of the two groups were "not so irreconcilable or so antagonistic as to require a severance" and that severance was not "justified."
 
 
 56
 A motion for severance is addressed to the discretion of the trial court, and to prevail defendant must make a strong showing of prejudice.... We review a trial court's denial of a severance motion for abuse of discretion and reverse only if denial deprived defendant of a fair trial, resulting in a miscarriage of justice.
 
 
 57
 United States v. Arruda, 715 F.2d 671, 679 (1st Cir.1983) (citations omitted).
 
 
 58
 At the outset, we express considerable skepticism concerning the applicability of a Swiderski defense to the facts of this case. Although the Swiderski court held that "[w]here two individuals simultaneously and jointly acquire possession of a drug for their own use, intending only to share it together, their only crime is personal drug abuse--simple joint possession, without any intent to distribute the drug further," 548 F.2d at 450, the court also made it unmistakably clear that its holding was "limited to the passing of a drug between joint possessors who simultaneously acquired possession at the outset for their own use." Id. at 450-51. The Swiderski holding appears fully justified on the facts of that case, but we hesitate to approve its casual extension to situations where more than a couple of defendants and a small quantity of drugs are involved, for, as the Swiderski court pointed out,
 
 
 59
 joint possession of a drug does not preclude a finding of possession with intent to distribute to a third person in violation of Sec. 841(a). Whether such an inference may be drawn depends upon the surrounding circumstances, including the nature of the relationship (whether it is commercial rather than personal), the quantity of the drug (whether it is too large for personal use only), the number of people involved, and statements or conduct on the part of the defendants.
 
 
 60
 Id. at 450; see United States v. Taylor, 683 F.2d 18, 21 (1st Cir.), cert. denied, 459 U.S. 945, 103 S.Ct. 261, 74 L.Ed.2d 203 (1982) (Swiderski inapplicable to complex operation, a large quantity of marijuana); United States v. Wright, 593 F.2d 105, 108 (9th Cir.1979) (Swiderski not applicable where drug not simultaneously and jointly acquired). In the unusual circumstances of the present case, the district court left to the jury the factual question whether appellants' religious practices could account for their possession of almost one ton of marijuana per defendant and thus negate an inference of intent to distribute to third persons. This may have been an overabundance of caution on the court's part, but it does not affect our analysis of the severance issue. The Swiderski defendants were entitled to pursue whatever factual defense they could support, however implausible it might seem to a finder of fact; in this case, they may have had no colorable alternative.
 
 
 61
 In denying the severance motions, the district court relied on our decision in United States v. Talavera, 668 F.2d 625 (1st Cir.), cert. denied sub nom. Pena v. United States, 456 U.S. 978, 102 S.Ct. 2245, 72 L.Ed.2d 853 (1982). In Talavera, we stated:
 
 
 62
 Severance is required only where the conflict is so prejudicial and the defenses are so irreconcilable that the jury will unjustifiably infer that this conflict alone demonstrates that both are guilty.
 
 
 63
 Id. at 630. Applying this standard, the district court reasoned:
 
 
 64
 The jury in this case could find both groups of defendants guilty or not guilty without making any logical error. Just, for example, it is clear in the view of this Court that the finding by the jury that the [Swiderski defendants] possessed marijuana without intending to distribute it beyond themselves or other individuals also on or in the vicinity of the Leurs property, in no way would compel a finding that any other defendant was on the Leurs property or near the Leurs property at that time or that any other defendant also possessed marijuana, either actively or constructively, or that any other defendant intended to distribute it in any way.
 
 
 65
 We find this reasoning persuasive, and conclude that Talavera is controlling in this case. As in Talavera, one defense to the charge of possession with intent to distribute contests both elements of possession and intent, while the other contests only the element of intent. The defenses would become irreconcilable only if the conventional defendants were allowed to allege as part of their defense that the Swiderski defendants intended to distribute the marijuana. Talavera, 668 F.2d at 630. This was not done.
 
 
 66
 A related contention concerning the denial of severance is that the testimony presented by the Swiderski defendants concerning the quantity and methods of marijuana consumption by Ethiopian Zion Coptic Church members had a prejudicial "spillover effect" on the conventional defendants.[34] See Arruda, 715 F.2d at 679. We note, however, that the district court repeatedly instructed the jury during the trial and in the final charge to "consider the evidence as to each count separately and separately with respect to each defendant." The court also specifically cautioned the jury that mere association with a group of defendants who might be members of the same church was not sufficient evidence to establish the existence of a conspiracy. These instructions were properly given to cure any potential spillover effect. The jury must have heeded the instructions, for its verdicts were clearly not reached on an arbitrary or undifferentiated basis. Of the eight conventional defendants, five were acquitted on count one and convicted on count two, one was convicted on both counts, one was convicted on the first count only, and one was acquitted on both counts; of the eight Swiderski defendants, four were convicted on both counts and four on the second count only. We find that appellants failed to meet their heavy burden of showing that the denial of severance motions made their trial unfair.
 
 V. CONCLUSION
 
 67
 Appellants' other sundry contentions lack merit.[35] There was sufficient evidence to convict each of the appellants found on or about the Leurs property on October 20, 1980. The convictions cannot have been based on mere presence, but reflect the surrounding circumstances as well: there was a common association, false names were given to the arresting officers, flight was attempted, large amounts of marijuana were found nearby in plain view, and convincing alternative explanations were lacking. This is a far cry from the situation in United States v. Francomano, 554 F.2d 483 (1st Cir.1977), where the defendants had no prior association, the amounts of marijuana were small and readily concealed, and their presence aboard ship was apparently unrelated to the contraband cargo.
 
 
 68
 Finally, it is clear that the district court adequately investigated the possibility of jury taint. The single juror who indicated the slightest ground for concern was promptly excused, and the remaining jurors were regularly questioned as to whether they had been exposed to media reports inadvertently or otherwise. Although one defense attorney apparently contravened a court order in attempting to ferret out rumors of additional jury taint, the rumors he brought to the court's attention were never substantiated by affidavit or presented in a post-trial motion as the court suggested. We see no basis for challenging the convictions on this ground.
 
 
 69
 We conclude, therefore, that appellants have failed to prove reversible error or prejudicial unfairness in the conduct of the trial.
 
 
 70
 The convictions are affirmed.
 
 ORDER OF COURT
 
 71
 ON PETITION FOR REHEARING FILED BY ATTORNEY COOK
 
 
 72
 The petition for rehearing filed by James Cook on behalf of appellants is denied. Appellants seek to equate the panel decision affirming dismissal in United States v. Middleton, 673 F.2d 31 (1st Cir.1982), with a severance of Middleton from the other defendants without regard to the pendency of a timely motion for rehearing. As we held at pages 23-24 of our slip opinion in the present case, the dismissal as to Middleton became operative as the equivalent of a severance for purposes of the Speedy Trial Act only when we issued our mandate on August 17 after considering and denying the government's petition for rehearing. Although, as appellants recognize, the district court could have entered an "ends of justice" continuance under (h)(8) as to the other defendants while the motion for rehearing in Middleotn remained pending, we think this would have been superfluous, for the exclusion under (h)(1)(E) was automatic. Furthermore, unlike (h)(1)(J), (h)(1)(E) does not provide for an exclusion automatically limited to 30 days; the holding in Unted States v. Black, 733 F.2d 349 (4th Cir.1984), concerning an (h)(1)(J) exclusion for an untimely petition for rehearing in banc filed after the issuance of the appellate court's mandate, is not in point. We have already considered and rejected J. Shnurman's contention that the denial of a thirty-day continuance following his arraignment on the superseding indictment violated his rights under the Speedy Trial Act or the sixth amendment. Slip op. at 25-29 & n. 28.
 
 ORDER OF COURT
 
 73
 ON PETITION FOR REHEARING FILED BY CARL ERIC OLSEN
 
 
 74
 Upon consideration of the petition for rehearing filed by Carl Eric Olsen,
 
 
 75
 It is ordered that said petition be and the same hereby is denied.
 
 ORDER OF COURT
 
 76
 ON PETITION FOR REHEARING FILED BY JACOB SHNURMAN
 
 
 77
 The petition for rehearing is denied. Petitioner Jacob Shnurman claims that he was denied the opportunity to present a "factual defense" to the jury based on the theory that "the seized marijuana was jointly possessed by the membership of the Zion Coptic Church." The district court properly ruled that on the facts of this case there was no basis in law or fact for such a defense because the only people who could have acquired joint and simultaneous possession, see United States v. Swiderski, 548 F.2d 445, 450-51 (2d Cir.1977), were those present when the marijuana was unloaded. For reasons fully set forth in our slip opinion, the first amendment does not supersede the criminal sanctions against possession of marijuana with intent to distribute. Petitioner's argument lacks merit.
 
 
 78
 Petitioner also disagrees with our reasoning distinguishing his situation from that of members of the Native American Church who enjoy an administrative exemption for their religious use of peyote. Our reasoning is fully set out in our slip opinion, and we see no reason to supplement it or reconsider it.
 
 ORDER OF COURT
 
 79
 ON PETITION FOR REHEARING FILED BY THOMAS G. CONVERSE
 
 
 80
 The petition for rehearing filed by James Poliquin on behalf of appellant Thomas Converse is denied. Neither the conventional defendants nor the Swiderski defendants alleged as part of their defense that the other group (or any individual defendant) intended to distribute the marijuana. Under our controlling holding in United States v. Talavera, 668 F.2d 625 (1st Cir.), cert. denied sub nom. Pena v. United States, 456 U.S. 978, 102 S.Ct. 2245, 72 L.Ed.2d 853 (1982), which we have already declined to reconsider, the district court had discretion to deny the motions for severance.
 
 
 
 *
 Of the District of Rhode Island, sitting by designation
 
 
 [1]
 D. Rush, L. Lancelotti, G. Lancelotti, Leaton, H. Shnurman, Risolvato, Cohen, Converse, Johnson and J. Shnurman
 
 
 [2]
 Imoberstag and Olsen
 
 
 [3]
 Collins and Brown
 
 
 [4]
 Middleton, D. Rush, L. Lancelotti, G. Lancelotti, Leaton, H. Shnurman, Risolvato, Cohen, Converse, Johnson, Booth, Hanson, Imoberstag, Olsen, J. Shnurman, J. Tranmer, C. Nissenbaum, D. Woodward, B. Rush, O'Hara, Collins, Brown and Lawler
 
 
 [5]
 D. Rush, L. Lancelotti, G. Lancelotti, Leaton, H. Shnurman, Risolvato, Cohen, Converse, Johnson, Hanson, Imoberstag, Olsen, J. Shnurman, Collins, Brown and D. Nissenbaum
 
 
 [6]
 D. Rush, L. Lancelotti, Cohen, Collins and Brown
 
 
 [7]
 D. Nissenbaum's motion for a judgment of acquittal at the conclusion of the evidence was granted with respect to the second count; his case went to the jury only on the conspiracy count
 
 
 [8]
 G. Lancelotti, Leaton, H. Shnurman, Risolvato, Converse, Johnson, Imoberstag, Olsen and J. Shnurman
 
 
 [9]
 Hanson
 
 
 [10]
 All of the twenty-four defendants except for D. Nissenbaum were named in the original October 29 indictment
 
 
 [11]
 The (h)(1)(F) exclusion applies whether the pretrial motion is filed before or after indictment. See S.Rep. No. 93-1021, 93d Cong., 2d Sess. 32-33 (1974), reprinted in A. Partridge, Legislative History of Title I of the Speedy Trial Act of 1974 94 (Fed.Judicial Center 1980)
 
 
 [12]
 This and subsequent exclusions apply to D. Nissenbaum on the same basis as to the other defendants. Although D. Nissenbaum was first named in the superseding indictment returned on February 4, 1981, the speedy trial computations with respect to him under the seventy-day time limit are the same as for the defendants named in the original indictment because no nonexcludable time had yet run as to the others before February 4. The superseding indictment, of course, made no difference in the speedy trial computations for the defendants named in the original indictment. See Mitchell, 723 F.2d at 1045; Novak, 715 F.2d at 817-18
 
 
 [13]
 The question whether the denial of severance was an abuse of discretion under Federal Rule of Criminal Procedure 14 is analytically distinct; it is discussed in Part IV
 
 
 [14]
 D. Rush, H. Shnurman, Cohen, Johnson, Hanson, Imoberstag, J. Shnurman, Collins, Brown, Lawler, B. Rush and O'Hara
 
 
 [15]
 Middleton, L. Lancelotti, G. Lancelotti, Leaton, Risolvato, Converse, D. Nissenbaum and Booth
 
 
 [16]
 Olsen
 
 
 [17]
 L. Lancelotti, Converse and Olsen
 
 
 [18]
 Middleton, Risolvato and Booth
 
 
 [19]
 Imoberstag
 
 
 [20]
 Leaton
 
 
 [21]
 Middleton, L. Lancelotti, G. Lancelotti, Booth, Imoberstag, J. Shnurman, B. Rush, Collins, Brown and Lawler
 
 
 [22]
 Section (h)(8) provides an exclusion for:
 (A) Any period of delay resulting from a continuance granted by any judge on his own motion or at the request of the defendant or his counsel or at the request of the attorney for the Government, if the judge granted such continuance on the basis of his findings that the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial. No such period of delay resulting from a continuance granted by the court in accordance with this paragraph shall be excludable under this subsection unless the court sets forth, in the record of the case, either orally or in writing, its reasons for finding that the ends of justice served by the granting of such continuance outweigh the best interests of the public and the defendant in a speedy trial.
 (B) The factors, among others, which a judge shall consider in determining whether to grant a continuance under subparagraph (A) of this paragraph in any case are as follows:
 (i) Whether the failure to grant such a continuance in the proceeding would be likely to make a continuation of such proceeding impossible, or result in a miscarriage of justice.
 (ii) Whether the case is so unusual or so complex, due to the number of defendants, the nature of the prosecution, or the existence of novel questions of fact or law, that it is unreasonable to expect adequate preparation for pretrial proceedings or for the trial itself within the time limits established by this section.
 ....
 (iv) Whether the failure to grant such a continuance in a case which, taken as a whole, is not so unusual or so complex as to fall within clause (ii), would deny the defendant reasonable time to obtain counsel, would unreasonably deny the defendant or the Government continuity of counsel, or would deny counsel for the defendant or the attorney for the Government the reasonable time necessary for effective preparation, taking into account the exercise of due diligence.
 (C) No continuance under paragraph (8)(A) of this subsection shall be granted because of general congestion of the court's calendar, or lack of diligent preparation or failure to obtain available witnesses on the part of the attorney for the Government.
 
 
 [23]
 This appears to be the concern underlying section 6(d)(3) of the Speedy Trial Plan adopted by the District of Maine, which provides:
 The court may grant a continuance under 18 U.S.C. Sec. 3161(h)(8) for either a specific period of time or a period to be determined by reference to an event (such as recovery from illness) not within the control of the government....
 
 
 [24]
 Leaton apparently withdrew his waiver of speedy trial claims as of October 25, 1982. By that time, however, the government's October 12 motion concerning the first amendment defense was pending. The government's motion, along with H. Shnurman's November 2 speedy trial motion, was finally decided on November 23, 1982. An appeal from the latter ruling was filed on November 30. In no event can Leaton allege sufficient nonexcludable time between October 25 and trial to show a Speedy Trial Act violation
 
 
 [25]
 Under section 4(d) of the Speedy Trial Plan, a superseding indictment such as the one in this case does not trigger a new seventy-day time limit:
 Superseding Charges. If, after an indictment or information has been filed, a complaint, indictment, or information is filed which charges the defendant with the same offense ..., the time limit applicable to the subsequent charge will be determined as follows:
 ....
 (2) If the original indictment or information is pending at the time the subsequent charge is filed, the trial shall commence within the time limit for commencement of trial on the original indictment or information.
 Section 7 of the Plan provides:
 Minimum Period for Defense Preparation. Unless the defendant consents in writing to the contrary, the trial shall not commence earlier than 30 days from the date on which the indictment or information is filed, or, if later, from the date on which counsel first enters an appearance or on which the defendant expressly waives counsel and elects to proceed pro se. In circumstances in which the 70-day time limit for commencing trial on a charge in an indictment or information is determined by reference to an earlier indictment or information pursuant to section 4(d), the 30-day minimum shall also be determined by reference to the earlier indictment or information....
 
 
 [26]
 If any indictment or information is dismissed upon motion of the defendant, or any charge contained in a complaint filed against an individual is dismissed or otherwise dropped, and thereafter a complaint is filed against such defendant or individual charging him with the same offense or an offense based on the same conduct or arising from the same criminal episode, or an information or indictment is filed charging such defendant with the same offense or an offense based on the same conduct or arising from the same criminal episode, the provisions of subsections (b) and (c) of this section shall be applicable with respect to such subsequent complaint, indictment, or information, as the case may be
 18 U.S.C. Sec. 3161(d)(1).
 
 
 [27]
 Section (h)(6) provides the following exclusion:
 If the information or indictment is dismissed upon motion of the attorney for the Government and thereafter a charge is filed against the defendant for the same offense, or any offense required to be joined with that offense, any period of delay from the date the charge was dismissed to the date the time limitation would commence to run as to the subsequent charge had there been no previous charge.
 
 
 [28]
 We find no merit in J. Shnurman's contention that the denial of a thirty-day continuance, quite aside from Speedy Trial Act requirements, violated his sixth amendment right to effective assistance of counsel. Not only was this appellant responsible for delaying his arraignment and foreseeable change of counsel until the last minute, but, through counsel, he rejected the seven-day continuance proposed by the district court as a reasonable accommodation. He neither explains why the seven-day continuance would have been insufficient nor suggests how a thirty-day continuance would have met his needs. The record, moreover, reveals a thoroughly competent and active performance by his court-appointed attorney
 
 
 [29]
 "Congress shall make no law ... prohibiting the free exercise [of religion] ...." U.S. Const. amend. I
 
 
 [30]
 The ruling was carefully tailored to exclude evidence only in relation to the first amendment defense; at trial, two defense witnesses were permitted to testify as to the quantity and methods of marijuana consumption by Church members in support of the Swiderski defense discussed in part IV
 
 
 [31]
 The conventional group comprised D. Rush, G. Lancelotti, Leaton, Risolvato, Converse, Johnson, Hanson and D. Nissenbaum
 
 
 [32]
 The Swiderski group comprised L. Lancelotti, H. Shnurman, Cohen, Imoberstag, Olsen, J. Shnurman, Collins and Brown
 
 
 [33]
 Fed.R.Crim.P. 14 provides, in relevant part:
 If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires.
 
 
 [34]
 Although Thomas Reilly, a witness called by the Swiderski group to testify as to marijuana consumption within the Ethiopian Zion Coptic Church, stated that he "recognized" all of the defendants as fellow adherents of the Church, his testimony concerning specific individuals concerned only members of the Swiderski group. Reilly did not--indeed, he could not--testify as to the presence of any conventional defendant on the Leurs property on October 20, 1980, or any defendant's possession of marijuana or intent to distribute it to third persons at that time
 
 
 [35]
 Appellants' motions for a judgment of acquittal or a new trial were denied from the bench by the district court on February 18, 1983. Appellant J. Shnurman is correct in attributing the court clerk's handwritten notation "granted" on two of those motions to clerical error